1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                          NORTHERN DISTRICT OF CALIFORNIA

8

9    TRI DUNG NGUYEN,                          No. C 07-2479 MHP (pr)

10              Petitioner,                     **ORDER DENYING HABEAS
                                                PETITION**
11         v.

12   TOM FELKER, warden,

13              Respondent.
     _____/
14

15                               **INTRODUCTION**

16         Tri Dung Nguyen filed this pro se action seeking a writ of habeas corpus under 28

17   U.S.C. § 2254.  The matter is now before the court for consideration of the merits of the

18   amended petition.  For the reasons discussed below, the amended petition will be denied.

19                               **BACKGROUND**

20         Nguyen challenges his conviction for murdering his girlfriend.  The evidence of the

21   crime was summarized by the California Court of Appeal:

22         The victim, Quyen Bui, had a tempestuous and violent relationship with defendant.
           Often drunk, defendant once smashed a bottle over her head and repeatedly made
23         threats about killing or harming her. On June 4, 2002, two days after he was arrested
           for threatening Ms. Bui, she obtained a restraining order against defendant. Five days
24         later, on June 9, 2002, neighbors observed defendant and Ms. Bui engage in a heated
           argument. The neighbors called 911 for police. When officers arrived they found Ms.
25         Bui dead from multiple stab wounds. Defendant was lying atop her body, and a
           bloody knife, which was the likely murder weapon, lay nearby. Defendant admitted
26         killing Ms. Bui. According to his version, she initiated the fight, she produced the
           knife, she stabbed him first, and she followed him when he tried to flee.
27

28   Resp. Ex. G, California Court of Appeal Opinion ("Cal. Ct. App. Opinion"), p. 1.

Evidence of several prior statements Bui made to the police during domestic violence incidents was admitted at trial.  Nguyen's defense was that he and Bui argued often, that she was physically violent with him many times, and that he stabbed her in self-defense using the same knife she had used to stab him.

At a jury trial in 2004 in Alameda County Superior Court, Nguyen was convicted of first degree murder with personal use of a deadly weapon.  Cal. Penal Code §§ 187(a), 12202(b)(1).  He was sentenced to 26 years to life in prison.

Nguyen appealed.  The California Court of Appeal affirmed his conviction and the California Supreme Court denied his petition for review.  Nguyen filed unsuccessful state habeas petitions before filing this action.

Nguyen's amended petition for writ of habeas corpus alleged several claims for relief: (1) the trial court violated his rights under the Sixth Amendment's Confrontation Clause by admitting testimonial hearsay statements; (2) he received inadequate assistance of appellate counsel in that appellate counsel failed to properly raise a Confrontation Clause claim regarding certain witnesses' testimony; and (3) he received inadequate assistance of trial counsel in that his attorney (a) failed to investigate and present exculpatory physical evidence regarding blood on Nguyen's shirt, (b) failed to object to the prosecutor's improper cross-examination of Nguyen, (c) failed to object to the prosecutor's closing statement, and (d) failed to ensure that the jury was fair and impartial.  The court found the claims to be cognizable in a federal habeas action and ordered respondent to show cause why the amended petition should not be granted.   Respondent filed an answer and Nguyen filed a traverse.  The matter is ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in Alameda County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  Respondent does not contend that state court remedies were not exhausted for the claims in the amended petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask

3

1    whether the state court's application of clearly established federal law was "objectively

2    unreasonable." Id. at 409.

3                                          **DISCUSSION**

4    A.       Confrontation Clause Claim

5             1.       Background

6             Nguyen contends that his right of confrontation was violated when the trial court

7    allowed into evidence statements that the victim, Quyen Bui, made to police officers and to

8    911 operators on four occasions.  The prosecutor moved in limine to have the statements

9    admitted into evidence, and the defense argued that they were barred by the Confrontation

10   Clause as interpreted by Crawford v. Washington, 541 U.S. 36 (2004).  The trial judge

11   permitted the evidence, finding that Crawford did not apply and that Nguyen had forfeited

12   his right to raise a Confrontation Clause challenge to the admission of Bui's statements by

13   killing her.  The challenged statements occurred on four occasions:

14   **March 26, 1999.**  Former Alameda Police Officer Nickl testified that on this date she
     was dispatched to investigate a domestic violence dispute. Nickl spoke with Ms. Bui,
15   who related that she had gotten into a fight with defendant after he had consumed a
     great deal of beer. Defendant hit and kicked her before she summoned police. Ms. Bui
16   declined medical treatment and would not press charges against defendant.

17   **October 17, 2001.**  Oakland Police Officer Jim testified that on this date he was
     dispatched to investigate a report of domestic battery. Jim spoke with Ms. Bui, who
18   related that defendant had repeatedly hit her, stopping only when she threatened to
     call police. Jim observed no visible proofs of injury.
19
20   **June 2, 2002.**  A recording of the 911 call made on this date was played for the jury.
     The voices on the tape belonged to defendant, Ms. Bui, a friend of defendant and Ms.
21   Bui named Tran, the 911 dispatcher, and a translator. The call commenced with
     defendant stating: "I get problem with my family. I want to go in jail." A translator
22   came on the line and spoke with Tran, who stated that defendant had been drinking,
     "he mad his wife. He wanted to hurt his wife you know. He want to go to the jail." At
23   the dispatcher's request, Ms. Bui came on the line and, speaking through the
     interpreter, stated: "[S]he said that the . . .  man who wants to go in jail. . . . [H]er
24   husband makes too many trips to Viet Nam to visit his ex-girlfriend. . . . [A]nd that's
     what they are upset about. . . . And when her husband went back to the United States
25   he argued with her and beat her up. . . . Today her husband did not beat her up but
     used the gun and threatened to kill her." "[H]er husband did not use the gun to
26   threaten her today, but did use the gun to threaten to kill her and her children on May
     26. . . . Today her husband does not have the gun." "[T]he police need to rush over
27   because he is trying to kill her now."

28   Alameda Police Officer Germany testified that she was dispatched to Ms. Bui's home
     at approximately 9:15 p.m. to investigate a family dispute. Germany observed

                                               4

defendant banging on a security gate over the front door. When Ms. Bui came to the door, defendant spoke with her angrily. Because defendant was "very drunk," he was arrested. He told Germany: "I want to go to jail. I called you. When I get out of jail, I will kill her." Later that night Germany returned to Ms. Bui's house and spoke with her. Ms. Bui stated defendant "had always been violent towards her, and that he had threatened to kill her several times in the past by shooting her." Before he was arrested, defendant told Ms. Bui he would come back and kill her and the children.

**June 9, 2002.** Ms. Bui called 911 at approximately 3 a.m. This tape too was played for the jury. Ms. Bui told the dispatcher that her boyfriend, whom she identified as "Tri," "broke my window. . . . He . . .  go in jail a couple day ago. . . . He . . .  come back. He want to kill me."

Cal. Ct. App. Opinion, pp. 2-3.

The California Court of Appeal rejected Nguyen's Confrontation Clause claim for three reasons.  First, Bui's statements on June 2, 2002 to a police dispatcher before Nguyen was arrested that day were not testimonial.  "The general tenor of the questions does not appear aimed at eliciting information incriminating to defendant (such as 'What did he do to you?'), but rather at the understandable desire to determine precisely what was happening, whether an immediate response was required, and what officers would confront if sent to the scene."  Id. at 5.  Second, any of Bui's statements that were testimonial were admissible under the forfeiture rule – i.e., the statements could be admitted because Nguyen had caused Bui to be unavailable for confrontation at trial by his own wrongful act. Id. at 6.  (As discussed below, the U.S. Supreme Court has rejected this view of the forfeiture rule.)  Third, if the forfeiture rule did not apply, it was harmless error to admit the statements that were testimonial.  Id. at 5-6, n. 3.   As the California Court of Appeal explained, the trial court and parties' analyses only discussed the June 2, 2002 statements, but the ruling applied to the statements on other days.  Id. at 4, n. 2.

2.    Analysis

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.  The right applies to the states through the Fourteenth Amendment.  See Pointer v. Texas, 380 U.S. 400, 403 (1965).  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but "it is a procedural rather than a substantive guarantee.  It commands, not that

1  evidence be reliable, but that reliability be assessed in a particular manner: by testing in the

2  crucible of cross-examination." Crawford v. Washington, 541 U.S. at 61.

3      The Confrontation Clause applies to all "testimonial" statements. See Crawford, 541

4  U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the

5  purpose of establishing or proving some fact." Id. at 51 (citations and quotation marks

6  omitted); see id. ("An accuser who makes a formal statement to government officers bears

7  testimony in a sense that a person who makes a casual remark to an acquaintance does not.")

8  In Davis v. Washington, 547 U.S. 813 (2006), the Supreme Court distinguished testimonial

9  and nontestimonial statements to police. "Statements are nontestimonial when made in the

10  course of police interrogation under circumstances objectively indicating that the primary

11  purpose of the interrogation is to enable police assistance to meet an ongoing emergency.

12  They are testimonial when the circumstances objectively indicate that there is no such

13  ongoing emergency, and that the primary purpose of the interrogation is to establish or prove

14  past events potentially relevant to later criminal prosecution." Id. at 822; see, e.g., id. at 826-

15  28 (victim's frantic statements to a 911 operator naming her assailant who had just hurt her

16  were not testimonial); id. at 829-30 (victim's statements made by victim to officer to tell him

17  what had happened were testimonial, as there was no emergency in progress and were made

18  after police officer had separated victim and assailant); Crawford, 541 U.S. at 39-40, 68

19  (statements were testimonial where made by witness at police station to a series of questions

20  posed by an officer who had given Miranda warnings to witness and was taping and making

21  notes of the answers).

22      A Crawford claim, like other Confrontation Clause claims, is subject to harmless error

23  analysis. United States v. McClain, 377 F.3d 219, 222 (2d Cir. 2004). In the context of

24  reviewing a state court conviction under 28 U.S.C. § 2254, this means that habeas relief is

25  available only if the admission of the evidence had a "substantial and injurious effect or

26  influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623

27  (1993).

28      After the California Court of Appeal's decision in Nguyen's case, the Supreme Court

6

issued a decision that rejected one of the theories on which the California Court of Appeal had relied to reject Nguyen's claim.  In <u>Giles v. California</u>, 128 S. Ct. 2678 (2900), the Court held that the "forfeiture by wrongdoing" doctrine extinguishes the right of confrontation only when the defendant engaged in conduct designed to prevent the witness from testifying. <u>Id.</u> at 2683.   It is not enough that the witness is unavailable as a result of the defendant's acts; rather, that unavailability must be the result of defendant's acts taken with the intent to prevent the person from appearing as a witness.  <u>See</u> <u>id.</u> at 2682-88.  There is no evidence that the killing or any other action taken by Nguyen was done with the intent to prevent Bui from appearing as a witness against him.  Therefore, under <u>Giles</u>, Nguyen did not forfeit his right of confrontation with regard to any of Bui's statements.  The California Court of Appeal's rejection of Nguyen's Confrontation Clause claim on the ground that he had forfeited it by killing the maker of the statement therefore cannot be relied upon to uphold his conviction.  However, setting aside the forfeiture analysis only brings this court to consideration of the two other reasons identified by the California Court of Appeal in rejecting the claim, viz., that some statements were not testimonial, and the admission of those statements that were testimonial was harmless.  As to those reasons, the state appellate court was clearly correct.

Several of the challenged statements were not testimonial.  Bui's statements to the 911 operator (through a translator) on June 2, 2002 were nontestimonial under the guidelines set out in <u>Davis</u>.  At the time she made those statements, Nguyen was present and had threatened to kill her that day, and she asked the police to "rush over" because Nguyen was trying to kill her.  These statements were just the kind of statements made during an ongoing emergency to obtain police help that <u>Davis</u> explains are nontestimonial. Likewise, Bui's statements to the 911 operator on June 9, 2002 were nontestimonial because they were made during an ongoing emergency and for purposes of securing police assistance:  she told the 911 operator that Nguyen had come back after being in jail, had broken her window, and wanted to kill her.  (This call apparently was made just minutes before he did kill her.)  As to those statements, the state court's rejection of the Confrontation Clause claim was not an

unreasonable application of, or contrary to, <u>Crawford</u> or <u>Davis</u>.  Even though the California Court of Appeal affirmed Nguyen's conviction a couple of months before the <u>Davis</u> decision was announced, that court correctly separated the testimonial from the nontestimonial statements of Bui.

Several of Bui's statements were testimonial.  Bui's statements to officer Nickl on March 26, 1999 (that Nguyen had hit and kicked her before she summoned police) and Bui's statements to officer Jim on October 27, 2001 (that Nguyen had repeatedly hit her and stopped when she threatened to call police) were testimonial because the emergency had ended and the statements were more for the purpose of proving past abuse for the eventual prosecution of Nguyen.  Similarly Bui's statements to officer Germany on June 2, 2002, when the officer returned to the house after Nguyen had been arrested were testimonial because the need for immediate police help had passed and the statements were more for future use in a prosecution of Nguyen.

The admission of these testimonial statements was harmless error, however, in light of the other evidence that was properly admitted.  There was testimony from a police officer that Nguyen said that he would kill Bui after he had been arrested on June 2.  Specifically, while he was in the patrol car, Nguyen reportedly said: "'I want to go to jail.  Take me to jail. I called you.  When I get out of jail, I will kill her.'" RT 250.  (Nguyen denied making the statement.)  Even without Bui's testimonial statements, there still remain her nontestimonial statements in the June 2, 2002 911 call to the effect that Nguyen had beaten her in the past and was threatening to kill her that day, and in the June 9, 2002 911 call to the effect that he had broken her window and wanted to kill her.

Nguyen suggests that the elimination of evidence of the March 26, 1999, and October 17, 2001 incidents would have shown there was no history of violence.  This ignores the fact that the most probative incidents are those nearest in time to the killing – and even with the elimination of the first two statements (made years and months before the killing), there still was admissible evidence that a week before the killing and minutes before the killing, Nguyen was threatening to kill her and had beaten her in the past.  <u>See</u> RT 348.  Not

only were there admissible nontestimonial statements from Bui, there was evidence from a third party of Nguyen's prior violence and violent attitude.  Their friend Tran testified that Nguyen had said at some time in the past, "'If she does not love me anymore, then both of us will die,'" RT 208, and that Nguyen had hit Bui in the head with a beer bottle just a week before the killing,  Nguyen admitted that he had hit Bui with a beer bottle, RT 343.  Nguyen argues unpersuasively that the admission of the testimonial statements was prejudicial because, other than the bottle incident described by Tran, there was no physical evidence that supported Bui's statements.  The fact that the defendant broke a bottle over his girlfriend's head a week before stabbing her is highly damaging to his assertion of self-defense.  Moreover, there needn't be physical evidence to make the domestic violence picture believable – especially when it was Nguyen himself who had initiated the 911 call a week before the killing and had asked to be put in jail because he wanted to hurt his wife.

Nguyen also argues that the admission of Bui's testimonial statements to police was prejudicial because no one saw the beginning of the physical encounter that culminated in the killing, and argues that nothing controverted his testimony that she attacked him first.  This argument fails.  Even if no third party saw the first move, the third party testimony made his story quite implausible and would not have been viewed differently if Bui's testimonial statements had been excluded from evidence.  The nature of Nguyen's attack on Bui was established by eyewitnesses.  Several neighbors saw them arguing and moving around outside, with Bui quickly walking in front and Nguyen following her.  Neighbor Sang Le testified that Bui loudly screamed, "Oh, my God.  Oh, my God," while frantically banging at his door.  RT 155.  Sang Le witnessed Nguyen grabbing Bui and stabbing her while she attempted to push him away.  Sang Le's brother, Phong Le, awoke to hear Bui yell "somebody help me."  RT 277-78.   Yet another neighbor, known as "Auntie Five" heard Bui yell, "Auntie Five, please save me.  Please help me."  RT 134.  Phong Le stated that after Nguyen stabbed Bui, Nguyen held the knife with one hand and used the other hand to pound the knife into his stomach, and faced Bui and said, "I kill you, now I'm going to kill myself."  RT 292.  No witness saw activities that corroborated Nguyen's version (in which Bui stabbed

him repeatedly inside and outside the apartment, Bui chased him, he pounded on a neighbor's door for help, and he became too weak to resist her before he started stabbing her). Nguyen's testimony that Bui stabbed him inside her apartment was undermined by the absence of blood in her apartment. And his testimony that she kicked out the window was undermined by the evidence that most of the glass was inside the apartment, her 911 call, and the absence of cuts on her feet. Finally, the jury heard that Bui suffered 47 knife wounds, and had injuries on her left arm consistent with defensive wounds.

It can be said with great certainty that the admission of the testimonial statements made by Bui to the police did not have a substantial and injurious effect on the verdict. Nguyen is not entitled to the writ on this claim.

B.    Ineffective Assistance Of Appellate Counsel Claim

In an argument related to the Confrontation Clause argument discussed above, Nguyen alleges that his appellate counsel was ineffective in that he failed to develop the Confrontation Clause claim sufficiently with regard to some of Bui's statements. As mentioned in the preceding section, Bui's testimonial statements were made to officer Nickl on March 26, 1999, to officer Jim on October 17, 2001, and to officer Germany on June 2, 2002. Appellate counsel had focused on the statements made to officer Germany. Nguyen faults appellate counsel for not developing the claim with regard to Bui's statements made to the other two officers, which caused that part of the claim to be deemed waived by the state appellate court.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. See Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland v. Washington, 466 U.S. 668, 686 (1984). A defendant therefore must show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Miller v. Keeney, 882 F.2d 1428, 1434 & n.9 (9th Cir. 1989) (citations omitted). Appellate counsel does not have a

10

constitutional duty to raise every nonfrivolous issue requested by a defendant.  See Jones v. Barnes, 463 U.S. 745, 751-54 (1983).  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  See Miller, 882 F.2d at 1434.  Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason–because he declined to raise a weak issue.  Id.

Here, for the reasons discussed in the preceding section, Nguyen's Confrontation Clause claim fails.  Since any error in the admission of the testimonial statements was harmless, appellate counsel was not ineffective for failing to more fully develop the argument that the admission of the statements to officers Nickl and Jim was error.  Even if appellate counsel had raised the issue, it would not have been successful.  Nguyen is not entitled to the writ on the ineffective assistance of appellate counsel claims.

C.    Ineffective Assistance Of Trial Counsel Claims

Nguyen contends that he received ineffective assistance of trial counsel in that his attorney (a) failed to investigate and present exculpatory physical evidence regarding blood on Nguyen's shirt, (b) failed to object to the prosecutor's improper cross-examination of Nguyen, (c) failed to object to the prosecutor's closing statement, and (d) failed to ensure that the jury was fair and impartial.

This claim was raised in a state habeas petition that was denied with minimal discussion.  The Alameda County Superior Court denied the petition raising the ineffective assistance of counsel claim as untimely, as well as for failure to state a prima facie case for relief.  Resp. Exh. K.  The court explained that the petition failed to show deficient performance by counsel or prejudice to Nguyen.  Id.

The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective assistance, of counsel.  See Strickland, 466 U.S. at 686.  The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Id.  To prevail on an ineffective

assistance of counsel claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, id. at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  See id. at 691-94.  The relevant inquiry under Strickland is not what defense counsel could have done, but rather whether his choices were reasonable.  See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998), cert. denied, 525 U.S. 1159 (1999).  A lawyer need not file a motion or make an objection that he knows to be meritless on the facts and the law.  See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996), cert. denied, 519 U.S. 1142 (1997) (failure to take futile action is not deficient performance).

       1.    Failure To Test T-Shirt.

       Nguyen argues that trial counsel was deficient in not having Nguyen's t-shirt tested to determine if some of the blood on it was his.  To understand this claim, it is necessary to recount some of the evidence.  Bui lived in apartment B, but died in a small courtyard in front of the door to apartment D in her complex.  When the police arrived, Nguyen was laying atop Bui's body, with his mouth on one of her breasts.  He was wearing only pants and shoes, as he had removed his t-shirt and jacket after killing her and before being observed stabbing himself twice.  Bui's pants had been pulled down slightly, and her shirt and bra had been pulled up to expose her breasts.  Nguyen testified that she had been the initial aggressor, that she had pulled up his t-shirt and stabbed him in the stomach and in the leg while they were in her apartment, that she had chased him out into the courtyard, that she pulled up his shirt and stabbed him several more times, that he ran to apartment D and knocked on the door (but didn't say anything), and that he only stabbed her to save himself when she attacked him again.  He claimed to have been afraid because he was already bleeding a lot and thought that she would kill him if he fell down.  He admitted that he stabbed himself twice after he killed her and after he had removed his jacket and shirt.  A resident in apartment D saw Nguyen stab himself twice after removing his shirt, before that resident turned away to use

1  the telephone to call the police.   The prosecutor's theory was that Nguyen killed Bui because

2  she had rejected him, and then stabbed himself.

3       In his federal habeas petition, Nguyen contends that, if his attorney had his t-shirt

4  tested, and the test showed Nguyen's blood on it, his self-defense story would have had

5  objective support in that the presence of his blood would show that he wore the shirt after

6  having been stabbed in the abdomen by Bui.  Such test results, he argues, would have

7  undermined the prosecution's theory that all his stomach wounds were self-inflicted after he

8  killed Bui and was shirtless.

9       The trial court considered the bloody t-shirt question and refused a post-trial motion to

10  delay sentencing so that defense counsel could have the shirt tested.  The trial court

11  explained that there was a substantial amount of blood at the scene of the killing, and that

12  Nguyen's blood could have been transferred onto the shirt after he removed it.  The trial court

13  refused to delay sentencing to allow time for testing of the shirt because it was only

14  speculative that the testing would lead to any evidence that would help Nguyen.

15       Like the trial court, this court sees the t-shirt's value as very speculative.  Nguyen has

16  not shown that his t-shirt was put in a place far enough away from the action that blood could

17  not have been transferred onto it after he took it off.  The picture he did submit (CT 311)

18  does not show a t-shirt, let alone a t-shirt far away from the victim's body.  The trial record

19  available to this court does not assert Nguyen's assertion that the evidence showed that the

20  shirt was far away from the blood.  There was evidence that he removed his shirt, but not

21  where that shirt went once removed from his body.  The picture he did submit also shows

22  what appears to be a large amount of blood and witnesses testified that there was a

23  significant amount of blood in the courtyard where Bui and Nguyen were found.  Also, the

24  crime scene had been disturbed after the crime, which could have resulted in movement of

25  the shirt or depositing blood on it.  The victim was found in a seated position against the wall

26  of apartment D, and was moved by police officers to a supine position so they could

27  administer C.P.R.  RT 66, 69; see CT 311.  Nguyen also had been moved: he was found atop

28  Bui, was pulled off her by police officers, RT 69, then rolled over on his own, and then was

rolled back onto his stomach by police and handcuffed, RT 70.  <u>See also</u> CT 68-69 (officer
Simmons' testimony at preliminary hearing that he pulled Nguyen's pant legs so he would
come straight off the victim and then pulled the victim in the same direction so that she was
laying flat on the cement).  At least four law enforcement officers were in the courtyard area
tending to Bui and Nguyen.  There thus was ample opportunity for his and her blood to get
on the shirt after it was removed from his body, and Nguyen has no evidence that the shirt
was placed and remained in an area where it was safe from contact with the blood.  The trial
court's view of the situation – that any of his blood that was on the shirt might have gotten
there by transfer in the courtyard – was reasonable.

      Counsel's post-trial motion to test the shirt suggests that he made a calculated choice
before trial not to test the shirt and only wanted it tested after the guilty verdict because there
was nothing left to lose at that point in time.  A decision not to have the shirt tested would
have been within the range of reasonable professional assistance in light of the tremendous
downside potential and limited upside potential.  The self-defense theory would have been
ruined if Nguyen's blood <u>was</u> <u>not</u> on the shirt.  It was rather unlikely that the jury would
believe -- as Nguyen had asserted as an explanation of the absence of holes in the shirt -- that
Bui pulled up his shirt and stabbed him; it would have been completely unlikely that a jury
would believe that she had stabbed him in the abdomen and left no holes and caused no
bleeding.  On the other hand, his self-defense theory would not have been helped much if his
blood <u>was</u> on the shirt.  The prosecution could still argue (consistent with evidence
mentioned in the preceding paragraph) that Nguyen's blood was deposited on the shirt from
other surfaces at the place where Bui was killed and Nguyen admittedly had stabbed himself.
Also, if the shirt came to be a central piece of evidence, the defense would have the problem
of explaining why he had removed the shirt after killing the victim.  The prosecutor could
argue that Nguyen's removal of it was done to destroy/alter evidence, which would show
consciousness of guilt and increase the likelihood of a first degree murder conviction.
Making the shirt a central piece of evidence also would have allowed the prosecutor to
emphasize more his argument that Nguyen wanted to defile the victim one last time after

1   killing her as suggested by the position of the bodies as well as their states of undress.  In

2   sum, the shirt presented significant potential problems for the defense and its untested state

3   allowed the defense to make arguments that would have been foreclosed if the test had

4   produced bad results.

5          Respondent argues that it was most likely that the blood on the t-shirt was from both

6   Nguyen and Bui.  Nguyen argues that the state's unequivocal position at trial was that none

7   of the blood on the shirt was his.  The "unequivocal position" was argument in response to

8   the defense argument that the prosecution should have tested the shirt, and does not preclude

9   the position respondent now takes.  (The prosecutor had even argued that the Le brothers did

10  not see all the action because Nguyen had more than two stab wounds.)   Nguyen also argues

11  that respondent's view that there would be a mix of blood is purely speculative.  Technically,

12  it is speculation to suggest the source(s) of blood on the untested shirt.  But it is not much of

13  a leap to believe that the victim's blood would constitute a large amount of the blood on the

14  shirt worn by the person who inflicted 47 knife wounds on the victim at a very bloody crime

15  scene.

16         Even if a reasonably competent attorney would have had the t-shirt tested to determine

17  whether Nguyen's blood was on it to determine if it was from a direct bleed from his

18  abdominal wounds, there is no reasonable likelihood that the result of the proceedings would

19  have been different.  Other than Nguyen's statement that he stabbed her in self-defense,

20  virtually all the evidence pointed to him as the aggressor rather than defending himself.

21  Before the night of the killing, he had threatened to kill Bui and hit her.  Just minutes before

22  her death, Bui called 911 to try to summon help because Nguyen had broken her window,

23  and "he come back. He want to kill me."  Resp. Exh. C, 911 transcript from June 9, 2002.

24  Bui had 47 knife wounds from the attack by Nguyen.  Nguyen's statement that Bui had

25  started the incident by kicking out a window in her apartment while he was outside smoking

26  was inconsistent with (a) the police officers' testimony that most of the broken glass was

27  inside the apartment, (b) the absence of cuts on her feet, and (c) her 911 call.  Nguyen's

28  statement that Bui started the aggression by stabbing him in the thigh and stomach in her

apartment was inconsistent with the absence of blood in the apartment or anywhere except near and in the apartment D courtyard.  Nguyen's statement that Bui chased him was inconsistent with all eyewitness accounts: none of the four neighbors who had seen different parts of the episode had seen her chasing him and instead all described action consistent with her trying to get away from him, and three had heard her screaming for help.  The eyewitness testimony presented a chilling picture of Nguyen chasing Bui, struggling with her, and her calling for help until her voice faded as she was stabbed in front of the door to apartment D. Nguyen's self-defense story was far-fetched, and contradicted by the activities witnessed by his neighbors.  There is no reasonable likelihood that the result would have been different if the shirt had been tested and shown to have Nguyen's blood on it.   Nguyen's claim regarding the failure to test the t-shirt for his blood fails on both prongs of the Strickland test.

        2.    Failure To Object To Cross-Examination.

Nguyen testified at trial.  He argues that the prosecutor's cross-examination of him improperly introduced testimonial hearsay evidence from Eric Nguyen, who failed to appear as a witness at trial.  Had trial counsel objected, "the objection would have been sustained and none of the acts described would have occurred."  Petition for Writ at 12-13.

This claim is meritless.  The claim fails on the deficient performance prong of the Strickland test because Nguyen fails to identify any legal objection a reasonably competent attorney could have made to the prosecutor's questions.  The claim fails on both the deficient performance and prejudice prongs of the Strickland test because no damaging evidence was admitted as a result of defense counsel's non-objection.  To be sure, the prosecutor did ask several questions aimed at eliciting whether Nguyen had dissuaded his brother Eric from testifying, but Nguyen testified that he had not done so.  Therefore, the evidence was that he had not dissuaded his brother and that his brother had not taken him away from Bui's house earlier in the evening before the killing.  The jury received the standard instruction that the attorneys' questions are not evidence, RT 441, and the jury is presumed to have followed the instruction.  See Richardson v. Marsh, 481 U.S. 200, 207 (1987).

16

1        3.      Failure To Object To Prosecutor's Closing Argument.

2          Nguyen next argues that counsel was ineffective in not objecting to two statements

3    made in the prosecutor's closing argument that Nguyen thinks improperly attacked his

4    exercise of his right to remain silent.  The prosecutor argued:  "Who has time to fabricate?  I

5    asked him, 'you've had a chance to sit back, listen to testimony at the preliminary hearing,

6    and now, through an interpreter, and then makeup this story.'  Who's had time to fabricate,

7    not these witnesses because they were asked right after this incident occurred, what

8    happened.  And they told the police, what happened."   ART 35.  Much later in his argument,

9    the prosecutor returned to the theme: "Now, who has had two years to think about this story.

10   He has.  He has.  And the only story he can come up with are these outlandish tales.  But he's

11   had the time to think about this story."  ART 84.  Nguyen claims that these comments

12   amounted to Doyle error.

13         Due process requires that a defendant be able to exercise his Fifth Amendment right to

14   remain silent without being penalized at trial for doing so.  It is a due process violation for a

15   prosecutor to impeach exculpatory evidence presented by a defendant at trial with evidence

16   of the defendant's silence at the time of arrest and after receiving Miranda warnings.  Doyle

17   v. Ohio, 426 U.S. 610, 619 (1976).  However, a defendant's constitutional rights are not

18   violated by the prosecutor's comment in closing argument that the testifying defendant had

19   been present in court throughout the trial and thus had an opportunity to hear the testimony

20   of the other witnesses and tailor his testimony accordingly.  See Portuondo v. Agard, 529

21   U.S. 61, 73 (2000).  Portuondo explained that there is no reason to treat testifying defendants

22   differently from other testifying witnesses, and any witness' ability to hear other accounts and

23   to weave his testimony around it accordingly presents a potential threat to the integrity of the

24   trial.  "Allowing comment upon the fact that a defendant's presence in the courtroom

25   provides him a unique opportunity to tailor his testimony is appropriate – and indeed, given

26   the inability to sequester the defendant, sometimes essential -- to the central function of the

27   trial, which is to discover the truth."  Id.

28         The challenged comments come within the Portuondo rule and were not Doyle error.

17

The comments concerned Nguyen's credibility as a testifying witness, and not his silence.
The prosecutor was urging that Nguyen was not to be believed because he had the benefit of
hearing all the other witnesses' testimony before presenting his version of the killing.  The
prosecutor never mentioned or hinted that Nguyen remained silent after being advised of his
Miranda rights; indeed, the record does not indicate whether he ever was given Miranda
warnings, whether he was interrogated or whether he invoked his right to remain silent.  The
record thus does not show that defense counsel would have had any basis for objecting based
on a Doyle error.  Even if an objection had been made and the comments stricken, there is no
reasonable probability that the outcome would have been different.  The comments were not
the main theme of the closing argument, and instead the prosecutor focused on the
overwhelming evidence that supported the prosecution's case and undermined any self-
defense claim – including the evidence of Nguyen's past violence and threats to kill Bui, the
911 call by Bui shortly before she was killed, the eyewitness testimony that she was
screaming for help and he was pursuing her, and the physical evidence in the apartment (i.e.,
absence of blood and presence of broken glass) that undermined Nguyen's self-defense story.
Nguyen's claim falters on both the deficient performance and prejudice prong of the
Strickland analysis.

> 4.   Failure To Ensure That The Jury Was Fair And Impartial.

Nguyen complains that trial counsel provided ineffective assistance because he did not
object to the selection of certain jurors chosen to hear his case.  He is dissatisfied with
counsel's failure to challenge Juror #s 2, 4, 7, 8, and 12.  (He also complains about Juror # 1,
but that juror did not even hear his case because the prosecutor exercised a peremptory
challenge to her.  See Petition, Exh. L, 7/15/04 RT 88. )  Defense counsel did participate in
the questioning of jurors, and did exercise one peremptory challenge.

Nguyen filed only selected portions of the jury voir dire proceedings.  See Petition,
Exh. L, July 15, 2004 voir dire proceedings.  That choice by Nguyen precludes an
understanding of the overall jury selection proceedings so that a reviewing court cannot
assess the relative desirability of jurors or see whether there were any rehabilitating

comments made by the objected-to jurors.  Evaluation is more seriously hampered by the fact that the trial attorneys and trial court (unlike any reviewing court) have access to juror questionnaires and can see the jurors' body language.  The totality of the information bears on why a trial attorney accepts an imperfect juror.

Nguyen has not asserted a biased juror claim, but only that his attorney was ineffective for having failed to challenge five jurors who, in retrospect, Nguyen sees as having unfavorable traits.  Having reviewed the transcript, the court does not see an adequate showing that any of these allegedly undesirable jurors would have met the test for excusal for cause, i.e., that their views or beliefs would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions and the jurors' oath.  See Wainwright v. Witt, 469 U.S. 412, 424 (1985).  Mostly, the jurors expressed reservations but also gave answers to other questions that rehabilitated them.  Where, as here, the petitioner does not show that any juror was actually biased, his attorney's choices with regard to voir dire are precisely the kind of strategic choices as to which great deference must be afforded.  A difference of opinion as to trial tactics does not constitute denial of effective assistance, see United States v. Mayo, 646 F.2d 369, 375 (9th Cir.), cert. denied, 454 U.S. 1127 (1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available.  See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir.), cert. denied, 469 U.S. 838 (1984).

In addition to failing on the deficient performance prong of the Strickland analysis, this claim fails on the prejudice prong.  The quick deliberations in this case show that it was not a close case.  Cf. United States v. Lopez, 500 F.3d 840, 846 (9th Cir. 2007), cert. denied, 128 S. Ct. 950 (2008) ("'Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'")  The jury's verdict was read less than five hours after jurors started deliberating after a week of trial.  See CT 172.  As explained in more detail in the preceding sections, the undisputed evidence that Nguyen was the killer, the physical evidence that contradicted much of Nguyen's self-defense story, his history of violence toward Bui, his threats to kill Bui, Bui's 911 call for help shortly before being killed,

19

1  the eyewitness testimony from the four neighbors, and the 47 knife wounds to Bui's body,

2  made this an extremely strong case for the prosecution and made Nguyen's self-defense story

3  unbelievable.  No matter what impartial jury heard this case, there is no reasonable

4  probability that the outcome would have been different.

5        The state court's rejection of Nguyen's ineffective assistance of counsel claims was not

6  contrary to or an unreasonable application of clearly established federal law as set forth by

7  the U.S. Supreme Court.  Nguyen is not entitled to the writ on any of his ineffective

8  assistance of counsel claims.

9                         **CONCLUSION**

10        The amended petition for writ of habeas corpus is DENIED on the merits.  The clerk

11  shall close the file.

12        IT IS SO ORDERED.

13  DATED: May 4, 2009

14                            Marilyn Hall Patel

                              United States District Judge